ORIGINAL

Approved: *[signature]*
Brett M. Kalikow
Assistant United States Attorney

Before: HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

**19MAG2782.**

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

LORRAINE SHANLEY,

            Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1028A, 1344 and 2

COUNTY OF OFFENSE: New York

- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    DELEASSA PENLAND, being duly sworn, deposes and says that she is a Special Agent with the United States Attorney's Office in the Southern District of New York, and charges as follows:

COUNT ONE
(Bank Fraud)

    1. From at least in or about 2010 up to and including in or about 2017, in the Southern District of New York and elsewhere, LORRAINE SHANLEY, the defendant, did knowingly execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of such financial institution, by means of material false and fraudulent pretenses, representations, and promises, to wit, SHANLEY fraudulently obtained and expended at least approximately $410,000 held in the checking account of a charitable organization for which she volunteered as Treasurer by, among other things, forging the signature of another authorized signatory on the charity's

checks, double endorsing the charity's checks and cashing and depositing them into her own personal accounts, writing unauthorized checks and making unauthorized checking account payments to pay for personal expenses and to distribute money to herself and family members, and by making payments on a charity credit card which she had used to make unauthorized purchases for personal expenses.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT TWO
(Aggravated Identity Theft)

2. On or about August 26, 2016, in the Southern District of New York and elsewhere, LORRAINE SHANLEY, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SHANLEY possessed, used, and transferred the name and signature of another person in connection with the bank fraud, as charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the United States Attorney's Office in the Southern District of New York ("USAO"). I have been personally involved in the investigation of this matter, which has been investigated jointly by Special Agents of the Internal Revenue Service along with Special Agents in the USAO. I have been employed by the USAO since 2015, prior to which I was a Revenue Agent with the Internal Revenue Service for more than twelve years. This affidavit is based in part on that experience, on my conversations with other law enforcement officials and others, on my examination of various reports and records, and my interviews of witnesses. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

4.   As set forth more fully below, from at least in or about 2010 up to and including in or about 2017, LORRAINE SHANLEY, the defendant, fraudulently obtained the funds of a nonprofit organization ("Charity-1") for which she served as a volunteer and board member, and for which she held various titles at various times, including Secretary, Treasurer, and Public Relations Director, and which funds were held in Charity-1's bank account.  During this time period, SHANLEY fraudulently obtained money from a checking account held by Charity-1 (the "Charity-1 Account") in several ways, including, that she (1) forged the signature of another authorized signatory on checks drawing on the Charity-1 Account, which checks SHANLEY used to pay for her own personal expenses and to benefit herself and her family members; (2) double endorsed checks drawing on the Charity-1 Account which were payable to the names of various individuals, *i.e.*, on the back of the check, SHANLEY signed the name of the person to whom the check was issued and then signed her own name, and cashed or deposited the check into her personal bank account; (3) issued and caused to be issued checks drawing on the Charity-1 Account, which were not for authorized purposes, and which benefited SHANLEY and members of her family; and (4) charged various unauthorized personal expenses on a credit card belonging to Charity-1 (the "Charity-1 Credit Card"), which charges were paid off with money from the Charity-1 Account.

5.   In total, during this period, SHANLEY fraudulently obtained for unauthorized personal purposes approximately $410,000 in funds from the Charity-1 Account, which is over 20% of the total donations received by Charity-1 during that time period.

## Background

6.   Based on my interviews with past and present officers of Charity-1, I have learned, in substance and in part, the following:

   a.   Charity-1, which was founded in 1988, is a not-for-profit charity registered under section 501(c)(3) of the United States Internal Revenue Code.

   b.   From in or about 2010 to in or about 2017, Charity-1's official mailing address was an address in Staten

3

Island, New York, though Charity-1 did not own or maintain any physical premises.

   c. The mission of Charity-1 is to provide financial support to the widows and children of New York City Police Department ("NYPD") officers killed in the line of duty.

   d. The surviving spouses of NYPD officers killed in the line of duty ("duty widows" or "performance widows") are automatically eligible to be "members" of Charity-1. From in or about 2010 to in or about 2017, there were approximately 120 members of Charity-1.

   e. Charity-1 fulfills its mission principally by sending annual or biannual checks to members, which generally ranged from approximately $1,000 to $3,000. Charity-1's annual or biannual distributions are distributed equally to each member, *i.e.*, each member is supposed to receive the same amount during each payment cycle. In addition, Charity-1 would pay approximately one to five scholarships per year. Such scholarships generally ranged from approximately $2,000 to $4,000, and were exclusively issued for college expenses for the surviving spouse or child of an NYPD officer who died in the line of duty. Also, Charity-1 sometimes, but rarely, provided financial assistance for emergency or catastrophic situations.

   f. Charity-1 is funded primarily through the donations of governmental employees, through the NYC Gives (formerly known as the Combined Municipal Campaign, or CMC) program.

    i. Based on my review of publicly available information, I have learned, in substance and in part, that NYC Gives is a program that enables New York City employees to make charitable contributions to participating programs through payroll deductions.

    ii. Based on information provided by the entities that manage the NYC Gives program, Charity-1 received between approximately $200,000 and $275,000 per year for the years 2010 through 2017, for a total of approximately $1.9 million during that period. From 2010 to 2017, 99% of all donations paid to Charity-1 through NYC Gives were contributions from NYPD employees. On average, over 5,500 NYPD employees donated to Charity-1 per year.

The Fraud Scheme

7.  Based on my interviews with two former officers of Charity-1 ("Individual-1" and "Individual-2"), as well as my review of bank records for accounts belonging to Charity-1, LORRAINE SHANLEY, the defendant, and others, I have learned, in substance and in part, the following:

   a.  From at least in or about 2010 to in or about 2017, SHANLEY, Individual-1, and Individual-2 were all officers of Charity-1. Individual-1 and Individual-2 are surviving spouses of NYPD officers who died in the line of duty.  SHANLEY is a heart widow.  A heart widow is a surviving spouse of a NYPD officer who died of a heart ailment during his employment.

   b.  From at least in or about 2010 to in or about 2017, Charity-1 maintained the Charity-1 Account, which was a checking account at a branch of a bank ("Bank-1") located in Staten Island, New York.  Based on my review of publicly available information, I have learned, in substance and in part, that at all times between 2010 and 2017, Bank-1 was a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation.

   c.  Charity-1 used the Charity-1 Account to pay benefits to members and certain operating expenses, including charges associated with Charity-1's credit cards.

   d.  SHANLEY and Individual-1 were the only authorized signatories for the Charity-1 Account.  However, only SHANLEY had online access to the Charity-1 Account.

   e.  From at least in or about 2010 to in or about 2017, Charity-1 maintained a corporate credit card account with three authorized users, SHANLEY, Individual-1, and Individual-2. SHANLEY was authorized to use Charity-1 Credit Card for legitimate Charity-1 operating expenses.  Bank records differentiate between purchases made using the Charity-1 Credit Card assigned to SHANLEY, Individual-1, and Individual-2.

   f.  From at least in or about 2010 to in or about 2017, SHANLEY was the person who managed Charity-1's checking account, credit card payments, and tax filings.  For a time, SHANLEY had the official title of Treasurer.  However, at some point, Individual-1 was given the official title Treasurer, and SHANLEY was given the official title of Public Relations Director. However, SHANLEY at all times maintained

5

responsibilities for Charity-1's finances, and signed Charity-1's annual tax filings as Treasurer.

g. From in or about 2010 to in or about 2017, SHANLEY fraudulently obtained significant sums of money from the Charity-1 Account for purposes that were not authorized by Charity-1, and which benefited SHANLEY and her family members. Each calendar year, SHANLEY fraudulently obtained between approximately $24,000 and $74,000, totaling approximately $410,000 over the entire period.

h. Examples of some of the ways in which SHANLEY fraudulently obtained funds contained in the Charity-1 Account, and some of the purposes for which those funds were obtained, include the following:

i. SHANLEY double endorsed and deposited into her personal bank accounts two checks, dated November 30, and December 26, 2012, drawing on the Charity-1 Account totaling $4,000 ($2,000 each). The checks were payable to the names of two different individuals, neither of which was SHANLEY's name, and SHANLEY forged the signature of Individual-1 on each check. Each check was dated around the same time as the annual Charity-1 disbursement to members, and had "cmc campaign" in the memo line.

ii. SHANLEY double endorsed and deposited into her personal bank account one check, dated July 9, 2012, drawing on the Charity-1 Account totaling $6,000. The check was originally made payable to the name of an individual other than SHANLEY, and the word "scholarship" was written in the memo line.

iii. In and around 2011, 2012, 2014, and 2015, SHANLEY signed checks drawing on the Charity-1 Account and made an electronic transfer totaling approximately $63,000 for legal services and related expenses in relation to criminal charges made against SHANLEY's son, and at least approximately $8,700 of that money was subsequently returned to SHANLEY and deposited into bank accounts belonging to SHANLEY. Among the checks drawing on the Charity-1 Account were two checks SHANLEY signed dated May 24 and June 12, 2015, for the amounts of $10,000 and $15,000 respectively, which were paid to a law firm located in Manhattan, New York.

iv. From on or about January 10, 2012 to on or about October 19, 2017, SHANLEY signed checks drawing on the

Charity-1 Account and made a charge on the Charity-1 Credit Card to pay at least approximately $32,080 in SHANLEY's personal dental expenses to three different dentists. Payments for dental work using funds from the Charity-1 account were made in each calendar year between 2012 and 2017.

        v.      From on or about January 5, 2012 to on or about July 30, 2017, SHANLEY signed checks drawing on the Charity-1 Account totaling at least approximately $25,671 for landscaping services for SHANLEY's residence. Such payments were made in each calendar year between 2012 and 2017.

        vi.     From in or about December 2010 to in or about December 2014, at least approximately nine checks drawing on the Charity-1 Account totaling approximately $28,400 were made payable to a family member of SHANLEY ("Family Member-1"). Family Member-1 had special needs and SHANLEY had control of trust accounts set up for Family Member-1. Some of these checks from Charity-1 made payable to Family Member-1 contained notations in the memo line indicating that they were for the combined municipal campaign or for a scholarship. Family Member-1 is not a surviving spouse or child of an NYPD officer killed in the line of duty, and therefore was not eligible to be a member of Charity-1 so as to receive CMC disbursements or scholarships. In several instances, SHANLEY forged the signature of Individual-1 on checks made out to Family-Member 1, and/or double endorsed the checks made out to Family Member-1 and cashed them against or deposited them into two trust accounts held for the benefit of Family Member-1 which SHANLEY controlled.

        vii.    On or about August 26, 2016, SHANLEY forged the signature of Individual-1 on a check drawing on the Charity-1 Account, totaling $7,000, made payable to a family member of SHANLEY ("Family Member-2"), who is a police officer. Family Member-2 is not a member of Charity-1, and the payment to him was not authorized by Individual-1 or Individual-2.

        viii.   From on or about January 8, 2013 to on or about December 6, 2016, approximately 10 purchases were made on SHANLEY'S Charity-1 Credit Card from event ticket vendors, such as Stubhub, Vividseats, and Ticketmaster, totaling more than approximately $8,000. For example, on or about May 25, 2016, SHANLEY's Charity-1 Credit Card was used to make a purchase of $1,422.70 from Ticketmaster, located in New York, New York. The credit card records for the May 25, 2016 Ticketmaster purchase contain a notation "Barbara Streisand," which I believe, based

on my training and experience, indicates that the purchase was for Barbara Streisand concert tickets.

        ix.    On or about May 14, 2016, SHANLEY's Charity-1 Credit Card was used to make a payment of $961.28 to "DOF Parking & Camera Tix," located in New York, New York. Based on publicly available information, I believe that "DOF Parking & Camera Tix" refers to the New York City Department of Finance, which is responsible for collecting parking ticket and traffic camera violations.

        x.    From on or about May 18, 2011 to on or about September 1, 2015, SHANLEY wrote checks drawing on the Charity-1 Account to pay at least approximately $29,000 to a private primary school for the tuition of SHANLEY's grandchild. Charity-1 does not pay for the education expenses of grandchildren. On some of the checks written to the private school, SHANLEY forged the signature of Individual-1. The payments were not authorized by Individual-1 or Individual-2.

### Fraud Scheme Uncovered

8.    Based on my interviews with past and present officers of Charity-1, and my review of documents provided by Charity-1, I have learned, in substance and in part, the following:

    a.    In and around the fall of 2017, a new volunteer ("Volunteer-1") became involved in the management of Charity-1, and undertook efforts to modernize the charity's website and operations. As part of that effort, Volunteer-1 requested Charity-1's tax forms and records from Individual-1. Individual-1 obtained the tax forms and records from LORRAINE SHANLEY, the defendant, and turned them over to Volunteer-1.

    b.    Volunteer-1 identified various anomalies in the tax forms and records. Among them, on Charity-1's Form 990 Return of Organization Exempt From Income Tax for tax year 2016, the name and signature of the Charity-1 officer appeared to have been whited out, with Individual-1's name and signature written in. In addition, Volunteer-1 noticed various questionable expenses, such as department store purchases, rent payments (Charity-1 does not have a physical location and does not rent any property), and payments for the private-school tuition of SHANLEY's grandchild.

        i.    Based on my review of the actually filed Charity-1 Form 990 for tax year 2016, I have learned, in

substance and in part, that SHANLEY, not Individual-1, signed that tax form, and was listed as the Charity-1 Treasurer.

   ii. Based on my interview with Individual-1, I have learned, in substance and in part, that Individual-1 did not look at the tax forms and records SHANLEY provided before Individual-1 disclosed them to Volunteer-1. Indidivudal-1 did not sign the altered Form 990 that was provided to Volunteer-1.

  c. Volunteer-1 and founding members of Charity-1 inquired of Individual-1 about the tax form and questionable expenses. Individual-1 in turn contacted SHANLEY. In response, SHANLEY, in sum and substance, told Individual-1 that she would pay back the money in full that she had taken from Charity-1.

  WHEREFORE, I respectfully request that a warrant be issued for the arrest of LORRAINE SHANLEY, the defendant, and that she be arrested and imprisoned, or bailed, as the case may be.

_____
DELEASSA PENLAND
Special Agent
United States Attorney's Office

Sworn to before me this
**20**th day of March, 2019

_____
HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK