**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 9, 2020

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

**Re: *United States v. Lorraine Shanley*, 19 Cr. 383 (SHS)**

Dear Judge Stein:

The Government respectfully submits this letter in advance of sentencing of defendant Lorraine Shanley (the "defendant"), which is scheduled for January 14, 2020 at 2:30 p.m. As set forth in the revised final Presentence Investigation Report ("PSR") dated December 12, 2019 (Dkt. 26), the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 27 to 33 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government respectfully submits that a term of imprisonment within that range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A. Factual Background**

**1. Survivors of the Shield**

Survivors of the Shield Inc. ("SOS") is a 501(c)(3) not-for-profit charity dedicated to supporting the surviving widows and children of New York City Police Department ("NYPD") officers killed in the line of duty. The organization was founded in 1988 by three "duty widows", who knew well the emotional and financial devastation wrought by the early death of a loved one serving to protect the community.

SOS worked by collecting charitable donations and distributing the money directly to surviving spouses or children, who are automatically "members" of the charity. SOS sent these distributions once or twice per year, and they generally ranged from $1,000 to $3,000 given equally to each of the charity's approximately 120 members. A significantly smaller aspect of the charity's financial support to members was to grant a handful of college scholarships of $2,000 to $4,000 per year, and rarely, to provide emergency financial assistance to members. The support given to these surviving family members comes almost exclusively from other members of the NYPD. From 2010 to 2017, approximately 5,500 NYPD employees elected to give a portion of every

paycheck to SOS, generating approximately $200,000 to $275,000 per year, a total of approximately $1.9 million for the period. PSR ¶¶ 10–12.

**2. The Defendant's Embezzlement**

The defendant, Lorraine Shanley, exploited her position as a volunteer for SOS to embezzle hundreds of thousands of dollars intended to benefit all of the charity's members over the course of several years.

Shanley, herself the widow of an NYPD officer who died of a heart ailment while on the job but not in the line of duty, became a volunteer and board member of SOS, holding various positions, including Secretary, Treasurer, and Public Relations Director. Regardless of her official title, since at least 1999 through 2017, Shanley was responsible for managing the charity's finances—she was one of two signatories on the SOS checking account, possessed and authority to use one of the charity's three credit cards for legitimate charity-related expenses, and interfaced with accountants to prepare and sign the charity's tax returns. PSR ¶¶ 13–15.

Unbeknownst to the other SOS board members, Shanley used the charity's funds as if the charity was her own piggy bank. In each of the years 2010 through 2017, Shanley took for herself and her family between approximately $24,000 and $74,000 by writing unauthorized checks (including by forging the name of the other account signatory) and making unauthorized credit card purchases. In all, Shanley misappropriated $406,851 to the detriment of all the other widows and surviving children. PSR ¶¶ 13, 16, 19. For each of the years 2012 through 2017, Shanley failed to report her fraudulent income in her personal tax returns or pay any taxes on it. PSR ¶ 20.

Shanley perpetrated her scheme through numerous transactions. Specifically, Shanley made approximately 642 fraudulent purchases on SOS's credit and debit cards, and issued approximately 121 fraudulent checks. In at least the years 2012, 2013, and 2014, SOS's tax preparer questioned Shanley about the legitimacy of various payments and expenditures and the financial condition of SOS, but Shanley lied and kept going. These transactions went towards a variety of personal expenses and beneficiaries, including, among many other things:

- Checks Payable to Relatives: At least $35,000 in checks payable to Shanley's relatives who were ineligible for SOS distributions,[1] including some checks payable to a relative with special needs, but which Shanley double-endorsed and deposited into her own account;
- Residence: Over $25,000 for landscaping, $6,000 for property taxes, and over $4,500 for rent for her children;
- Dental Bills: Over $32,000 for her personal dental treatments;

[1] The Government's loss does not include the thousands of dollars Shanley separately received from SOS through the charity's distributions to members, for which SOS decided Shanley was eligible, in part because of her volunteering.

- Legal Expenses: Approximately $63,000 for her son's attorneys' fees (over $8,000 of which was returned to Shanley, but not returned to the charity);
- Private School Tuition: Approximately $29,000 for several years' tuition for her grandson;
- Phone and Wireless Services: Over $10,000 to phone providers like Apple, AT&T, and Verizon;
- Entertainment: Over $8,000 for event tickets;
- Travel: Over $2,000 for airfare for herself and her family for two trips to Florida; over $3,500 for a hotel on a third trip to Florida, and over $3,000 in rental car expenses;
- Eyewear: 25 purchases totaling over $10,000 at an optical store;
- Clothing and Luxury Purchases: Approximately 45 purchases totaling over $16,000 at retailers such as Bergdorf Goodman, Bloomingdales, Macy's, Neiman Marcus, Sears, and TJ Maxx.

PSR ¶¶ 13, 17.

**B. Procedural Background**

On March 21, 2019, the defendant was arrested, and on May 21, 2019, she waived Indictment and was arraigned on an Information. On September 20, 2019, the defendant pleaded guilty before Your Honor, pursuant to a plea agreement, to Count One and Counts Three through Eight of the Indictment, which charged the defendant with bank fraud, in violation of Title 18, United States Code, Section 1344, and six counts of making and subscribing a false tax return for each of the years 2012 through 2017, in violation of Title 26, United States Code, Section 7206(1).

Pursuant to the Plea Agreement, the parties agreed that the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 27 to 33 months' imprisonment, based on an offense level of 18 and a criminal history category of I. PSR ¶ 7. On December 12, 2019, the U.S. Probation Office in this District ("Probation") filed the PSR, and recommended a sentence of 24 months' imprisonment. PSR p. 22–24.

**C. Applicable Law**

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct and promote respect for the law. *Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**D. Discussion**

The sentencing factors applicable here require, among other things, balancing the nature and seriousness of the offense and the need to deter others from committing similar crimes, with the mitigating individual characteristics of the defendant. The Government respectfully submits that balancing these factors counsels in favor of a sentence of imprisonment that is within the Stipulated Guidelines Range.

Seriousness of the Offense and the Need for Just Punishment: The defendant's conduct is a serious violation of law. Simply put, the defendant defrauded a charity of hundreds of thousands of dollars, stealing from the widows and surviving children of NYPD officers killed in the line of duty. The magnitude of the fraud, $400,000, is substantial, especially because Shanley took for herself over 20% of the donations to the charity during the period charged. Moreover, the defendant's conduct was not a one-time or fleeting lapse in judgment. The defendant continued her scheme consistently for at least eight years, and engaged in hundreds of discrete transactions. If not for the diligence of SOS's new board members, Shanley would likely have continued the fraud to this day and beyond.

Furthermore, the defendant's actions represent a shocking breach of trust. Shanley occupied a privileged position within SOS's operations. She was trusted with responsibility for all of the charity's finances; she managed the bank account and credit cards, and was the point-of-contact for the accountants who prepared the charity's tax returns. She knew at the time that the other board members were not closely monitoring her actions and she took advantage to the fullest.

Notably, while the Guidelines calculation factors in Shanley's breach of trust, it does not expressly consider the nature of her victim. Shanley stole from a charity, an organization dedicated to helping others who are vulnerable and in need of assistance. Particularly here, because SOS distributed nearly all of the donations it received to its members, as a practical matter, it was as if Shanley was taking money from the hands of the survivors themselves.

The harm that the defendant inflicted went beyond the financial welfare of the survivors. Attached to this submission as Exhibit A are letters from five duty widows, including the current and a past president of SOS, as well as the other board member whose signature Shanley forged

repeatedly as part of her scheme. These women explain that, in addition to the personal financial and emotional injury the defendant inflicted on them, Shanley's treachery extended to the hard-working NYPD officers and employees who generously donated out of every paycheck to help support the families of their fallen brothers and sisters. Shanley betrayed these donors, too, and in the process jeopardized their continued support and the future vitality of SOS.

General Deterrence: The Court's sentence should also reflect the need adequately to deter others from engaging in similar conduct. General deterrence is particularly relevant in this case because of the nature of the fraud. Charitable fraud is a widespread problem. From 2008 to 2012, more than 1,000 large not-for-profit organizations indicated on federal disclosures that they had discovered significant losses to theft, embezzlement, and misappropriation of funds.[2] This statistic understates the problem, as it does not include charitable fraud in smaller not-for-profit organizations, churches, and private foundations, which are not required to make these federal disclosures. Several features of charitable organizations may make them more vulnerable to fraud, including few (and often volunteer) staff; a trusting environment; and significant contributions from donors. It is also generally difficult to unearth self-dealing schemes, especially when they are committed by those (such as financial officers) who are supposed to be preventing and detecting them. These factors strongly counsel in favor of a sentence that sends a clear message that those who breach their duties to charitable organizations for personal gain will face serious consequences.

Lack of Genuine Remorse: As to the defendant's history and characteristics, the defense, including the defendant herself, suggests that the defendant's conduct is mitigated because the defendant exercised bad judgment in response to a series of family hardships and financial pressures. To be sure, Shanley has faced terrible tragedy and many difficulties—the premature death of her husband and several family members, as well as children and other relatives struggling, emotionally, physically, and financially through drug addiction, divorce, disability, and special needs.

Here, however, the defendant's apparent lack of genuine remorse undermines the extent of the mitigation. First, Shanley's personal hardships are counterbalanced by her victimization of those very people who faced similar circumstances. By definition, each SOS member also confronted the premature and unexpected death of a spouse or parent in the line of duty. Each of the SOS members undoubtedly also experienced emotional and financial devastation as a result of these tragedies, as well as additional collateral or unrelated personal challenges. Through SOS, Shanley personally met these survivors. She learned about their struggles, comforted them, and assured them that SOS was there to help. Yet all the while, she was pocketing the money that had been donated to support them.

---

[2] *See* Joe Stephens & Mary Pat Flaherty, *Inside the hidden world of thefts, scams and phantom purchases at the nation's nonprofits*, WASH. POST, Oct. 26, 2013, *available at* https://www.washingtonpost.com/investigations/inside-the-hidden-world-of-thefts-scams-and-phantom-purchases-at-the-nations-nonprofits/2013/10/26/825a82ca-0c26-11e3-9941-6711ed662e71_story.html.

In addition, Shanley has repeatedly made excuses to the Court by misrepresenting and minimizing her criminal conduct. In her plea allocution, probation interview, and letter to the Court in connection with this sentencing, Shanley asserted that she believed her actions were justified because her self-dealing was limited to addressing specific, severe hardships.[3] During the plea, the Court asked Shanley whether she knew that what she was doing was wrong and illegal. Shanley responded, under oath, "I did abuse and I should not have . . . [but] it wasn't abundance, it wasn't for a new car or a new home. It was strictly for my special needs grandson, my children." Dkt. 23 ("Plea Tr."), at 30:2–4, 31:11, 31:18–20. The picture Shanley paints is misleading at best. As described above, Shanley misappropriated funds for a multitude of personal indulgences, including expenses related to her house and her car. She bought concert tickets, went on shopping sprees, and paid for landscaping and family vacations. She also used the charity credit card for everyday expenses such as gas, tolls, parking tickets, Uber and taxis, drug store purchases, and groceries.

In her sentencing letter, Shanley continues to express entitlement to the money she took. "I realize my mistake was not clearing this with the other Board Members. I believe if I had gone to them and asked them for assistance they would have agreed to do so." Ltr. of Lorraine Shanley, at 6; *see also* PSR ¶ 27 (similar). Shanley's regret is procedural, not substantive. It is abundantly clear that Shanley was not entitled to any of this money, many times more than any other member of SOS received, which Shanley knew well. Her theft—which she kept secret, disguised, and lied about for years—was unequivocally unjustified and wholly inconsistent with the mission and operation of SOS.

Shanley's excuses and efforts to minimize her conduct reveal a lack of genuine remorse. She does not deserve the leniency she seeks.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[3] Shanley's own words stand in contrast to the cooperative legal actions the defense has taken in connection with this criminal case, including waiving venue on the tax charges and entering into a tolling agreement concerning the 2012 tax year, which the Government acknowledges.

**E. Conclusion**

For the reasons set forth above, the Government respectfully submits that sentencing the defendant to a term of imprisonment within the Guidelines Range of 27 to 33 months is warranted and is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: ______________________________
Brett M. Kalikow
Assistant United States Attorney
(212) 637-2220

cc: Christopher Nalley, Esq. (via ECF and email)